# Illinois Official Reports

## Appellate Court

---

### *People v. Sims*, 2014 IL App (4th) 130568

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JERRY WAYNE SIMS, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-13-0568 |
| Filed<br>Rehearing denied | May 6, 2014<br>June 2, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for unlawful delivery of a controlled substance within 1,000 feet of a church were upheld where he was not prejudiced by his trial counsel's alleged ineffective assistance in failing to file a motion to suppress defendant's statement to the police, the provision of the Illinois Controlled Substances Act was not unconstitutionally vague as applied to defendant's case, the State proved the building was "used primarily for religious worship," and the trial court did not err in finding that there was no reason to appoint new counsel for defendant following the *Krankel* hearing held on remand from an earlier appeal. |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 11-CF-103; the Hon. Robert L. Freitag, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Jacqueline L. Bullard, and Ryan R. Wilson, all of State Appellate Defender's Office, of Springfield, for appellant.

Jason Chambers, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and Thomas R. Dodegge, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

PRESIDING JUSTICE APPLETON delivered the judgment of the court, with opinion.
Justices Turner and Steigmann concurred in the judgment and opinion.

**OPINION**

¶ 1   A jury found defendant, Jerry Wayne Sims, guilty of all four counts of the indictment: counts I and III, which charged him with unlawful delivery of a controlled substance within 1,000 feet of a church (720 ILCS 570/407(b)(2) (West 2010)), and counts II and IV, which charged him with unlawful delivery of a controlled substance (720 ILCS 570/401(d)(i) (West 2010)). Because counts I and III were based on the same drug sales as counts II and IV, the trial court imposed sentences only for the more serious offenses, those in counts I and III. The court sentenced defendant to concurrent prison terms of 22 years.

¶ 2   Defendant appeals on four grounds. First, he argues he received ineffective assistance of counsel. We find no prejudice, however, from the allegedly deficient performance of which defendant complains.

¶ 3   Second, defendant argues that section 407(b)(2) of the Illinois Controlled Substances Act (720 ILCS 570/407(b)(2) (West 2010)) is unconstitutionally vague as applied to the facts of his case. We disagree. The language of the statute is unambiguous. Defendant did not have to guess whether the statute applied to the facts of his case.

¶ 4   Third, defendant argues the State failed to prove that, at the time of the drug sales, the building at 411 East Mulberry Street in Bloomington was "used primarily for religious worship." See 720 ILCS 570/407(b)(2) (West 2010). On the contrary, when the evidence is regarded in the light most favorable to the prosecution, a rational trier of fact could find, beyond a reasonable doubt, that 411 East Mulberry Street was used primarily for religious worship on the dates of the drug sales.

¶ 5   Fourth, defendant argues that, in the *Krankel* hearing (see *People v. Krankel*, 102 Ill. 2d 181 (1984)), which the trial court held on remand from the previous appeal in this case, the court should have appointed new counsel to represent defendant in a posttrial hearing on his claims of ineffective assistance. We find no manifest error in the court's decision that there

was no possible neglect of the case by trial counsel and that the appointment of new counsel was unnecessary.

¶ 6    Therefore, we affirm the trial court's judgment.

¶ 7                                I. BACKGROUND
¶ 8                                A. The Indictment

¶ 9    On February 16, 2011, a grand jury returned an indictment against defendant. The indictment consisted of four counts.

¶ 10    Count I charged that on February 4, 2011, defendant committed the Class 1 felony of unlawful delivery of a controlled substance within 1,000 feet of a church (720 ILCS 570/407(b)(2) (West 2010))–a transaction the indictment calls "Buy One"–in that, while within 1,000 feet of "The Joyful Gospel Church located at 411 East Mulberry Street," he delivered cocaine, in an amount less than 1 gram, to confidential source No. 652 of the Bloomington police department.

¶ 11    Count II charged that on February 4, 2011, defendant committed the Class 2 felony of unlawful delivery of a controlled substance (720 ILCS 570/401(d)(i) (West 2010))–the same transaction, "Buy One"–in that he delivered cocaine, in an amount less than 1 gram, to confidential source No. 652.

¶ 12    Count III charged that on February 8, 2011, defendant committed the Class 1 felony of unlawful delivery of a controlled substance within 1,000 feet of a church (720 ILCS 570/407(b)(2) (West 2010))–"Buy Two"–in that, while within 1,000 feet of "The Joyful Gospel Church located at 411 East Mulberry Street," he delivered cocaine, in an amount less than 1 gram, to confidential source No. 652.

¶ 13    Count IV charged that on February 8, 2011, defendant committed the Class 2 felony of unlawful delivery of a controlled substance (720 ILCS 570/401(d)(i) (West 2010))–"Buy Two"–in that he delivered cocaine, in an amount less than 1 gram, to confidential source No. 652.

¶ 14    All four counts of the indictment alleged that, despite the classification of the offenses, defendant was subject to "mandatory Class X sentencing due to [his] prior record."

¶ 15                                B. The Jury Trial (May 2011)
¶ 16                                1. *The Testimony of Theresa Hall*
¶ 17                                a. The First Controlled Purchase

¶ 18    Theresa Hall, otherwise known as Theresa Pichon, testified she was a confidential informant for the Bloomington police department and that her "handler" was a Bloomington detective, Todd McClusky. She was paid $200 to $300 for each case.

¶ 19    On February 4, 2011, Hall told McClusky she thought she could buy cocaine from defendant, who lived in apartment B at 510 East Locust Street. That same day, McClusky gave Hall $100 in buy money and drove her to within one block of defendant's residence. She walked the rest of the way to the apartment building, went upstairs to apartment B, told defendant she had $100, and asked him "if he would give [her] anything." Defendant answered he could indeed give her something. He made a telephone call and asked the person on the other end of the line, " 'Samuel, are you available[?'] " Hall then gave defendant the $100, and he left the apartment.

¶ 20    About 15 or 20 minutes later, defendant returned to the apartment and told Hall "his guy was on the way." Defendant then left the apartment again after grabbing a Family Video bag.

¶ 21    Another 15 or 20 minutes went by, and defendant returned to his apartment a second time. This time he went into the bathroom, and he soon came back out and handed Hall some unpackaged cocaine. Because the cocaine was unpackaged, Hall assumed he had skimmed some of it off.

¶ 22    Hall left defendant's apartment, returned to McClusky's car, gave him the unpackaged cocaine, and told him about her encounter with defendant.

### b. The Second Controlled Purchase

¶ 24    On February 8, 2011, Hall returned to defendant's apartment to make a second controlled purchase of cocaine. She gave defendant $150, previously provided to her by McClusky. Defendant left the apartment and returned 30 to 40 minutes later with cocaine packaged in a Baggie. Hall then left the apartment and gave McClusky the cocaine she had bought from defendant. In her opinion, this cocaine was worth no more than $50, although she had paid $150 for it.

### c. The Attempt To Make a Third Controlled Purchase

¶ 26    Later in the evening on February 8, 2011, Hall returned to defendant's apartment to make a third controlled purchase. She gave him $95, previously provided to her by McClusky, and defendant left the apartment. This time, however, he did not return. Eventually, McClusky telephoned Hall and told her to leave the apartment. She did so.

### d. Hall's Own Use of Cocaine While Working as a Confidential Informant

¶ 28    On cross-examination, Hall admitted using cocaine while working as a confidential informant, even though her agreement with the Bloomington police department required her to abstain from using narcotics.

### e. Hall's Legal Troubles

¶ 30    Hall had been convicted of forgery. A drug problem, crack cocaine, had led to that misconduct.

¶ 31    After her forgery conviction, alcoholism got her in further trouble. In 2010, the State charged her with driving under the influence, and that case was still pending. She also had a pending misdemeanor charge for resisting arrest.

¶ 32    McClusky had done nothing to help her with these charges, and she did not expect any help from the State.

### 2. *The Testimony of Edward Shumaker*

¶ 34    A Bloomington detective, Edward Shumaker, testified that on February 8, 2011, he assisted McClusky with a search of defendant's apartment. During the search, Shumaker seized a digital scale from defendant's bathroom. He testified that such scales typically were used to weigh narcotics.

### 3. *The Testimony of Kevin Raisbeck*

A Bloomington detective, Kevin Raisbeck, testified that on February 8, 2011, he assisted with the investigation of defendant by performing a surveillance.

During the surveillance, another police officer informed Raisbeck that defendant had left his apartment and was walking to a nearby gas station. Raisbeck saw defendant at the gas station talking on his cell phone. He then saw defendant leave the gas station, meet with someone a few blocks away, and walk toward his apartment.

Later that same day, during the surveillance, Raisbeck saw defendant walk to the gas station and enter a vehicle. Then he saw defendant go to a Laundromat a few blocks away and get into a white Buick.

Soon afterward, defendant was arrested. Nothing of evidentiary value was found on his person.

### 4. *The Testimony of Brian Brown*

A sergeant with the Bloomington police department, Brian Brown, testified that on February 4, 2011, he was a member of the surveillance team investigating defendant.

At 1:55 p.m., Brown saw the confidential informant, Theresa Hall, enter defendant's apartment. Then he saw defendant leave his apartment and go to a nearby gas station, where he talked on his cell phone.

Brown saw defendant leave the gas station and return to his apartment. When defendant came out of his apartment again, Brown saw he was carrying a bag. He saw defendant walk to a Family Video store and go inside.

He then saw defendant leave the Family Video store and get into a white Buick, which drove around the block. He then saw defendant get out of the Buick and return to his apartment. Shortly afterward, Hall left defendant's apartment and met up with McClusky.

Brown testified he also helped with the surveillance on February 8, 2011. He saw Hall enter defendant's apartment at 1:48 p.m., and he saw defendant leave his apartment at 1:55 p.m., walk to the gas station, go inside the gas station, and come out talking on his cell phone. Defendant then walked south, and Brown lost sight of him (but there were other detectives in the area). At 2:25 p.m., Brown saw defendant return to his apartment. A minute later, Hall left the apartment.

### 5. *The Testimony of Steven Brown*

A Bloomington detective, Steven Brown, testified he likewise helped with the surveillance on February 4, 2011. At 2:20 p.m., he saw defendant walk into a Family Video store. When a white Buick arrived at the store, he saw defendant leave the store and get into the Buick. He videotaped defendant getting into the Buick (the video was played for the jury). Then he saw the Buick leave the Family Video parking lot and drop defendant off in front of his residence. The Buick was registered to Warren Locket.

Steven Brown also assisted with the surveillance on February 8, 2011. He testified that at 5:10 p.m. he saw Hall enter defendant's apartment and defendant leave his apartment shortly thereafter. Defendant then was arrested.

### 6. *The Testimony of Todd McClusky*

#### a. The First Controlled Purchase

McClusky testified he had been a police officer for 11 years and that he currently was assigned to the narcotics unit of the Bloomington police department, an assignment he had held for 5½ years. Part of his job was to work with confidential informants, including Hall. In return for compensation, Hall had been working as a confidential informant for the Bloomington police department since 2007. McClusky had worked with her in a number of cases, and he had found her to be very productive, although he suspected she used drugs during the three- or four-year period she had been a confidential informant. He did not think, however, that she used alcohol or controlled substances during the drug purchases at issue in the present case.

On February 4, 2011, Hall told McClusky she believed she could purchase cocaine at defendant's apartment, at 510 East Locust Street. McClusky agreed it was worth a try, so he assembled a team of narcotics detectives.

In preparation for the controlled purchase, McClusky searched the police vehicle he would use, and he also searched Hall. He had her remove her coat. He had her turn out her pockets and remove her shoes and socks. Then he requested her to turn out her shirt and bra so that any concealed contraband would fall out. He found no contraband on her person. McClusky testified that because all the police officers in his unit were male, Hall was not strip searched. He explained, however:

> "Theresa doesn't usually–the way she dresses, specific to her, there is not a whole lot of places to hide anything other than if she were to hide something, and we check their mouths and whatnot when we search them, but as a male police officer and working with all males, it's–the only place that could possibl[y] conceal any kind of dope that size would be in some sort of body part and so and I will give you that, yes."

In McClusky's experience, if drugs were concealed in someone's body cavity, the drugs would have an odor. He was aware of no evidence that the cocaine in the two controlled purchases from defendant had been concealed in a body cavity. He had never found any drugs or money on Hall that she had attempted to conceal or steal. If he had, he would have never again used her as a confidential informant.

After these searches, McClusky gave Hall $100 for the first controlled purchase. Other detectives performed a surveillance. Hall left the police vehicle at 1:53 p.m. on February 4, 2011, and walked to defendant's apartment. According to McClusky, she was in view at all times except when she was inside defendant's apartment. She returned to McClusky at 2:40 p.m. and gave him some unpackaged cocaine. He searched her in the same manner as before and found no other contraband.

#### b. The Second Controlled Purchase

There was a second controlled purchase on February 8, 2011. McClusky searched his car and Hall, as before. Other detectives performed a surveillance, as before.

This time, McClusky gave Hall $150 in buy money. At 1:45 p.m., he dropped her off in the vicinity of defendant's apartment. At 2:26 p.m., she returned with some crack cocaine.

¶ 58

### c. The Attempt To Make a Third Controlled Purchase, Terminated by Defendant's Arrest and the Execution of a Search Warrant

¶ 59 Around 5 p.m. on February 8, 2011, after obtaining a warrant to search defendant's apartment, McClusky sent Hall back to the apartment to attempt to make a third controlled purchase of cocaine. After Hall entered the apartment, however, and defendant left the apartment, McClusky telephoned Hall and called off the controlled purchase because the police had decided to go ahead and arrest defendant and execute the search warrant.

¶ 60

### d. Statements Defendant Made While Under Arrest

¶ 61 The police arrested defendant, and McClusky interviewed him in the police station. When McClusky explained to him why he was under arrest, defendant made an unsolicited statement. The prosecutor asked McClusky:

"Q. [D]id you tell him what he was charged with?

A. Yes.

Q. What did you tell him?

A. I told him it was a drug investigation, and it was over–we were speaking over some deliveries of cocaine.

Q. How did he respond to that?

A. He was very upset. He actually had cried at one point and stated that he just–he'd do anything to get out of trouble.

Q. Now, at that point you hadn't asked him any questions, correct?

A. No questions at all.

Q. Did you go over his *Miranda* rights with him?

A. Yes, I did."

¶ 62 Actually, it appears, from the recording of the interview, that McClusky omitted a *Miranda* warning. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Although McClusky advised defendant of his right to remain silent and his right to an attorney, he forgot to warn defendant that anything he said could be used against him in court.

¶ 63 The recording of the solicited statement was played to the jury, or rather, a portion of it was. In the recording, defendant confessed to McClusky that he and his girlfriend had a problem with cocaine and that he had been obtaining cocaine for people in order to support his and his girlfriend's habit. He said that his girlfriend, however, was not involved in any sales of cocaine.

¶ 64 After the video camera was turned off, defendant told McClusky that his supplier, the owner of the white Buick, was nicknamed Red. McClusky testified that Red was Warren Locket.

¶ 65

### e. Joyful Gospel Church

¶ 66 McClusky testified he was familiar with the neighborhood of defendant's apartment and that there was a church in the neighborhood. The prosecutor asked him:

"Q. What is one that's close by?

A. 411 East Mulberry. At the time it was Joyful Gospel Church. It has since changed names to Living Word Ministries, but it's a church at the corner of Evans and Mulberry, again 411 East Mulberry.

Q. Just so it's clear, on February 4, 2011 that church was there?

A. Correct.

Q. Been there a long time?

A. As long as I can remember being a police officer in Bloomington.

Q. How long have you been a police officer?

A. Ten years in Bloomington, one year in Normal, eleven years.

Q. So that church was open back when you started?

A. I can't remember, but as long as I can remember it's been a church.

Q. Certainly was open the day we're talking about?

A. Correct.

Q. And it changed its name, right?

A. That is correct."

¶ 67　　The prosecutor then showed McClusky some photographs. McClusky identified People's exhibit No. 8 as a photograph of the north side of the church. He testified the photograph was an accurate representation of the way the building looked on February 4, 2011, even though he took the photograph "about a week ago," that is, about a week before the trial. People's exhibit No. 8 is in the record, and it shows the entrance to an old brick building. The door is framed by a wooden portico painted white: 2 round columns about 10 feet tall holding up an entablature surmounted by a pediment. The number 411 is tacked to one of the columns. To the right of the columns a normal-sized window is partly visible. It has clear glass panes divided into right triangles. The sill of the window is a thick stone slab, and the window also has a large stone head, painted white, with an ornamental capstone carved in relief. This photograph contains no obvious religious symbol or imagery.

¶ 68　　The next photograph the prosecutor handed McClusky was People's exhibit No. 9. McClusky testified:

"A. This is the–just a little bit, probably about ten feet to the east. That's the sign for the Living Words Ministries Church that's in place to be little bit further off where the numerics were.

Q. That's recent?

A. Same day, yes, about a week ago.

Q. As far as that goes, that used to be the Joyful Gospel Church it says on there?

A. That's correct."

¶ 69　　People's exhibit No. 9 likewise is in the record. It shows a monument sign: a freestanding brick structure surrounding a display window framed in aluminum. Behind the glass of the display window are white plastic letters and numbers affixed to a black board. They say "THE LIVING WORD MINISTRIES" and announce that "WORSHIP" is at 10 a.m. and that "BIBLE STUDY" is at 6:30 p.m. on Wednesdays. They also give the name of the pastor. Beyond the monument sign, another side of the brick building can be seen.

¶ 70　　McClusky testified that, using a measuring wheel, which had been calibrated for accuracy, he had measured the distance from the church to defendant's apartment. The distance was 696

feet.

¶ 71                              7. *The Verdicts*

¶ 72      On May 17, 2011, the jury found defendant guilty of all four counts of the indictment. The trial court entered judgment on the verdicts.

¶ 73                    C. The Presentence Investigation Report

¶ 74      It appears from the presentence investigation report that defendant, born on December 30, 1969, has the following criminal history (we omit the numerous traffic violations, including several convictions of driving while his driver's license was suspended):

| DATE OF CONVICTION | OFFENSE |
| --- | --- |
| April 1988 | Burglary |
| October 1989 | Retail theft |
| March 1990 | Robbery |
| May 1992 | Delivery of a controlled substance |
| January 1995 | Resisting a peace officer |
| July 1996 | Domestic battery |
| June 1998 | Criminal damage to property |
| December 1997 | Resisting a peace officer |
| December 2000 | Resisting a peace officer |
| September 2001 | Criminal trespass to land |
| January 2002 | Possession of drug paraphernalia |
| March 2002 | Resisting a peace officer |
| July 2002 | Criminal trespass to land |
| July 2003 | Armed robbery with a firearm |
| December 2008 | Possession of cannabis. |

¶ 75                        D. The Sentences in This Case

¶ 76      On July 1, 2011, the trial court sentenced defendant only for counts I and III, imposing concurrent prison terms of 22 years for those counts.

¶ 77      The sentencing order says: "Convicted of a class 1 offense but sentenced as a *Class X* offender pursuant to 730 ILCS 5/5-5-3(c)(8)." (Emphasis in original.) Actually, as of February 2011, when defendant committed the charged offenses, section 5-5-3(c)(8) of the Unified Code of Corrections (730 ILCS 5/5-5-3(c)(8) (West 2010)) was blank; the provisions of that section had been moved to section 5-4.5-95(b) of the Unified Code of Corrections (730 ILCS 5/5-4.5-95(b) (West 2010)).

¶ 78              E. The Striking of the *Pro Se* Motion for a New Trial

¶ 79      On August 1, 2011, defendant filed a *pro se* motion for a new trial on the ground of ineffective assistance.

¶ 80      On August 18, 2011, the trial court struck the *pro se* motion because the court concluded it lacked subject-matter jurisdiction to consider the motion.

¶ 81                                                    F. The Direct Appeal

¶ 82        Defendant took a direct appeal. One of his arguments was that the trial court had erred by concluding it lacked subject-matter jurisdiction to investigate his *pro se* posttrial claims of ineffective assistance. *People v. Sims*, 2013 IL App (4th) 110915-U, ¶ 3. We agreed with that argument, and we remanded the case for a preliminary inquiry pursuant to *Krankel* and its progeny. *Id.* ¶ 8.

¶ 83                                      G. The *Krankel* Inquiry on Remand

¶ 84        On June 7, 2013, upon remand, the trial court held a *Krankel* hearing. In the hearing, defendant argued that if his trial counsel, Brian McEldowney, had performed a reasonable investigation, he would have discovered that, contrary to the indictment and contrary to McClusky's testimony in the trial, there was no "Joyful Gospel Church" at 411 East Mulberry Street at the time of the charged offenses. Rather, according to county records, "Joyful Gospel Church" sold the building in 2009. Defendant told the court:

> "THE DEFENDANT: And I told him that the church was sold in 2009.
>
> THE COURT: So you told Mr. McEldowney.
>
> THE DEFENDANT: I told him–I didn't tell him that the church was sold. I told him that the–the church that they got me under, the Joyful Gospel Church, that church is not there, and if he would have investigated the minister, the minister, John Brown, is right there in the audience. He would verify that. He sold the church in 2009.
>
> THE COURT: Okay. All right. As I said, we're not here for a full-blown hearing. We're just here to see if we are going further today, okay?"

(The record contains a warranty deed showing that on November 4, 2009, Joy Full Gospel Community Church sold 411 East Mulberry Street to The Living Word Ministries. On October 30, 2013, we granted a motion by defendant to supplement the record with this warranty deed, although it was not presented as evidence in the trial.)

¶ 85        Defendant also alleged ineffective assistance in that McEldowney had failed to file a motion for suppression premised on McClusky's omission of a *Miranda* warning, namely, the warning that anything he said could be used against him in court.

¶ 86        McEldowney was present for the *Krankel* hearing, and the trial court asked him if he had any response to defendant's allegations of ineffective assistance. McEldowney said:

> "With regard[ ] to the allegation that the church had changed hands, that was disclosed to me in discovery in the State's fifth discovery compliance, that the church was formerly known as the Joyful Gospel Church and was doing business at the time as the Living Word Ministries. ***
>
>                                      * * *
>
> Now, [defendant] did not indicate to me that the church had been sold. This is news that I am learning today. And if he had, I may have–I would have had my investigator conduct further investigations to determine whether the church was still functioning. But I believe that it's an issue, regardless of the factual determination, that would have had no material difference in the outcome of his sentencing."

¶ 87        The trial court asked defendant if he had anything further to add. Again defendant invited the court to "ask [John Brown] on the stand right now [whether] the church was sold in 2009." The court did not question Brown.

- 10 -

¶ 88   At the conclusion of the *Krankel* hearing, the trial court explained to defendant that, in order to prove a claim of ineffective assistance of counsel, defendant had to prove not only deficient performance on McEldowney's part but also resulting prejudice. The court accepted as true everything defendant said about the sale of the church in 2009. Even so, the court reasoned that the outcome would have been the same because "there was evidence that it was still operating as a church under a different name." Therefore, the court found no possible merit in defendant's claims of ineffective assistance and saw no need to appoint new counsel to pursue the *pro se* claims of ineffective assistance.

¶ 89   This appeal followed.

## II. ANALYSIS

### A. Trial Counsel's Failure To File a Motion for Suppression

¶ 92   Defendant argues he was in custody when, in response to McClusky's questions, he admitted selling cocaine to support his and his wife's cocaine habit. Defendant further argues that because McClusky failed to warn him, before the custodial interrogation, that anything he said could be used against him in court, McEldowney should have filed a motion to suppress the solicited custodial statement, a motion that the trial court surely would have granted (see *Miranda*, 384 U.S. at 479). Defendant argues that McEldowney's performance was substandard in that he failed to file a motion for suppression. The State does not dispute defendant's argument thus far.

¶ 93   Nevertheless, the State disputes the other element of ineffective assistance: prejudice. To prove ineffective assistance, a defendant must prove not only substandard performance but also resulting prejudice. *People v. Callahan*, 334 Ill. App. 3d 636, 641 (2002) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984)). If the substandard performance was a failure to file a motion for the suppression of certain evidence, the defendant suffered prejudice only if there is a "reasonable probability" not only that the trial court would have granted the motion but also that suppressing the evidence in question ultimately would have resulted in a better outcome for the defendant in the trial. *In re Marquita M.*, 2012 IL App (4th) 110011, ¶ 14. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 94   Defendant argues that when his custodial statement is subtracted from the evidence in the trial, there is a reasonable probability of an acquittal because the "the State's primary evidence against [him]" would have been Hall's testimony. No police officer actually saw Hall buy cocaine from defendant. There was no audio or video of the controlled purchases. None of the prerecorded currency was found on defendant's person. To believe that defendant sold cocaine to Hall, one would have to believe Hall's testimony–and Hall, defendant argues, was an unreliable witness with powerful incentives to lie. Not only was she a convicted felon, but she stood to make money from every controlled purchase of narcotics, and she admitted using narcotics while working as a confidential informant. To continue using narcotics and at the same time keep making money as a confidential informant so as to fund her habit, she had to protect her actual source of supply while framing others. Also, Hall had criminal charges pending against her, and success as a confidential informant would have only made her look better in her own sentencing hearing. Defendant suggests that the quantities of cocaine she purportedly bought from him were so "minute"–0.4 grams the first time and 0.6 grams the

second time–that Hall easily could have concealed them "in a fold of her bra or underwear." And as a male, McClusky necessarily was inhibited in his search of Hall's person.

¶ 95    Defendant acknowledges that when McClusky explained to him why he had been arrested–because of a drug investigation–defendant initially made an *unsolicited* statement that he would do anything to get out of trouble. Defendant agrees that *Miranda* would not bar this unsolicited statement. See *People v. Peo*, 391 Ill. App. 3d 815, 819 (2009). Even so, he insists that the unsolicited statement is ambiguous because, at the time, he could have "believed that he had been arrested for other drug activity."

¶ 96    The State responds that, even if, when defendant tearfully said he would do anything to get out of trouble, he had in mind some "other drug activity," this unsolicited statement nevertheless confirmed that he was involved in illegal drugs. According to the State, defendant's subsequent solicited, inadmissible statement merely expressed what was obvious from all the other evidence: that he was a middleman in the cocaine trade and that he acted as a middleman in sales of cocaine to Hall.

¶ 97    The State admits it is possible to come up with other explanations–that Hall concealed the cocaine on her person and McClusky failed to find it in the prepurchase searches or that Hall went to defendant's apartment building ahead of time and concealed the cocaine in the hallway–but the State argues these explanations are improbable and unreasonable, considering that, during both of the controlled purchases, members of the surveillance team observed defendant behaving in ways characteristic of a middleman. On both occasions, February 4 and 8, 2011, they observed him leave his apartment shortly after Hall's arrival, speak on his cell phone, meet with someone, and then return to his apartment, where Hall was waiting. Hall then left his apartment shortly after his return, met up again with McClusky, and gave him the cocaine.

¶ 98    We agree with the State that the only function defendant's solicited statement served in the trial was to express what was obvious from the other evidence. Subtracting the solicited statement creates no reasonable probability of an acquittal (see *Marquita M.*, 2012 IL App (4th) 110011, ¶ 14), no "probability sufficient to undermine confidence in" the guilty verdicts (see *Strickland*, 466 U.S. at 694). Therefore, the defense suffered no prejudice from the failure to file a motion for suppression. See *Marquita M.*, 2012 IL App (4th) 110011, ¶ 14.

¶ 99                          B. The Vagueness Challenge to Section 407(b)(2)

¶ 100    Defendant argues that section 407(b)(2) of the Illinois Controlled Substances Act (720 ILCS 570/407(b)(2) (West 2010)) is unconstitutionally vague as applied to the facts of his case. The first step is to make sure we *have* to decide the constitutionality of the statute. "If the case may be decided on other grounds, the constitutionality of a statute should not be addressed." *In re Barbara H.*, 183 Ill. 2d 482, 492 (1998). Because we disagree with defendant's other arguments, for the reasons we explain in this analysis, it is necessary for us to consider his argument that section 407(b)(2) is unconstitutionally vague as applied to the facts of this case. For purposes of this issue, our standard of review is *de novo*. *People v. Johnson*, 335 Ill. App. 3d 805, 807 (2002).

¶ 101    According to defendant, section 407(b)(2) is not "sufficiently definite to give [him] notice that the building located at 411 E[ast] Mulberry [Street] in Bloomington, Illinois, was a 'place used primarily for religious worship,' at the time of the charged acts" (in this context, he is quoting the statute, which lists a "church" as one of the examples of a "building, structure, or

place used primarily for religious worship" (720 ILCS 570/407(b)(2) (West 2010))). He compares 411 East Mulberry Street to the boa constrictor in *People v. Fabing*, 143 Ill. 2d 48 (1991).

¶ 102    In *Fabing*, the State charged the defendant with violating a provision of the Illinois Dangerous Animals Act (Ill. Rev. Stat. 1987, ch. 8, ¶ 240) in that he possessed four " 'life-threatening reptile[s],' " to quote a term from the statute. (Emphasis omitted.) *Fabing*, 143 Ill. 2d at 52-53. He possessed a 4-foot alligator; a 7-foot boa constrictor; and two Burmese pythons, each of which was 15 to 20 feet long. *Id.* at 52. The supreme court concluded it was clear enough that the alligator (*id.* at 58-59) and the pythons (*id.* at 57-58) were life-threatening.

¶ 103    The expert testimony, however, was conflicting as to whether the boa constrictor was life-threatening. *Id.* at 58. "[A] person of common intelligence would [have been] required to guess as to whether the boa constrictor was life-threatening," and therefore the statute was "unconstitutionally vague as applied to [the] defendant's possession of the boa constrictor." *Id.* A statute violates due process if the statute is "so vague that men of common intelligence *** necessarily [have to] guess at its meaning or application." (Internal quotation marks omitted.) *Id.* at 53.

¶ 104    In the present case, defendant was not "required" to guess whether 411 East Mulberry Street was being used primarily as a place for worship. *Id.* at 58. He did not "necessarily" have to guess. *Id.* at 53. He could have performed an investigation before selling drugs in the area. By "using an objective method," such as observation, he could have ascertained whether the building was being used primarily as a church. *State v. Davis*, 970 P.2d 336, 338-39 (Wash. Ct. App. 1999). He could have watched the building on Sunday morning to see whether any parishioners went in. See *Whatley v. State*, 928 N.E.2d 202, 206 (Ind. 2010). He could have consulted the pastor. See *id.* He demonstrated his ability to reach the pastor by arranging for him to attend the *Krankel* hearing. Because there were ways to objectively determine ahead of time whether 411 East Mulberry Street was a place used primarily for religious worship, we disagree that section 407(b)(2) is unconstitutionally vague as applied to the facts of this case.

¶ 105                    C. The Primary Use of 411 East Mulberry Street

¶ 106    To prove the unlawful delivery of a controlled substance within 1,000 feet of a church, the State must prove, beyond a reasonable doubt, that the building in question was "used primarily for religious worship" on the date of the offense. 720 ILCS 570/407(b)(2) (West 2010). One might think that because several additional years of imprisonment could be riding on that issue (720 ILCS 570/407(b)(2) (West 2010); 730 ILCS 5/5-4.5-30(a), 5-4.5-35(a) (West 2010)), the State would "elicit[ ] testimony from someone affiliated with the church," *e.g.*, a pastor or parishioner (*People v. Ortiz*, 2012 IL App (2d) 101261, ¶ 11). For some reason, however, that does not always happen, and consequently we end up with case law pondering the question of how thin and conclusory a police officer's testimony can be and still qualify as proof, beyond a reasonable doubt, that the building in question was used primarily as a place for religious worship (or as a school, park, or the like).

¶ 107    On the one hand, *People v. Foster*, 354 Ill. App. 3d 564, 568 (2004), holds that nomenclature is enough. According to *Foster*, all a police officer has to do is refer to the building by a proper name with the term "church" in it–"New Hope Church," for example–and

that proves, beyond a reasonable doubt, that the building was used primarily for religious worship on the date of the offense. *Id.*

¶ 108    On the other hand, cases subsequent to *Foster*, most notably *People v. Cadena*, 2013 IL App (2d) 120285, ¶ 17, and *People v. Boykin*, 2013 IL App (1st) 112696, ¶ 15, hold that uttering a proper name is not enough: the State must present evidence showing how the police officer acquired personal knowledge of how the building was used on the date of the offense.

¶ 109    Let us take a closer look at those three cases: *Foster*, *Cadena*, and *Boykin*.

¶ 110                                  1. *Foster*

¶ 111    In *Foster*, the trial court found the defendant guilty, in a bench trial, of unlawful delivery of a controlled substance within 1,000 feet of a church (720 ILCS 570/407(b)(2) (West 2002)). *Foster*, 354 Ill. App. 3d at 565.

¶ 112    The defendant appealed, and one of his contentions on appeal was that the State had failed to present any evidence "that the New Hope Church was a place used primarily for religious worship." *Id.*

¶ 113    In the bench trial, a police officer, Scott Korhonen, testified he had seen the defendant selling cocaine at 4310 West Crystal Street in Chicago. *Id.* Also, the parties stipulated that if Tom Nyhan were called as a witness, he would testify he had "measured the distance from 4310 West Crystal Street to the New Hope Church located at 4255 Division Street" and that the distance "measured 580 feet." *Id.* at 566.

¶ 114    The defendant argued on appeal that the State had "failed to show New Hope Church was a place used primarily for religious worship." *Id.* at 567. The First District responded: "In viewing the evidence in the light most favorable to the prosecution, we find a rational trier of fact could have inferred New Hope Church was a church used primarily for religious worship based on its name." *Id.* at 568. Thus, according to *Foster*, nomenclature alone is enough to prove, beyond a reasonable doubt, that a building is a " 'place used primarily for religious worship.' " *Id.* at 567 (quoting 720 ILCS 570/407(b)(2) (West 2002)).

¶ 115                                  2. *Cadena*

¶ 116    In *Cadena*, a jury found the defendant guilty of unlawful delivery of a controlled substance within 1,000 feet of a church (720 ILCS 570/407(b)(1) (West 2008)). *Cadena*, 2013 IL App (2d) 120285, ¶ 3.

¶ 117    On appeal, the defendant conceded he had violated section 401(c)(2) of the Illinois Controlled Substances Act (720 ILCS 570/401(c)(2) (West 2008)) by delivering a controlled substance, but he challenged the jury's finding that he had delivered the controlled substance within 1,000 feet of a church. *Cadena*, 2013 IL App (2d) 120285, ¶ 4. Specifically, he contended the State had failed to "present sufficient evidence to allow the finder of fact to conclude that the Evangelical Covenant Church was an active church on the dates of the offenses," *i.e.*, that it was " 'used primarily for religious worship' on the dates of the offenses." *Id.* ¶ 10 (quoting 720 ILCS 570/407(b)(1) (West 2008)).

¶ 118    The Second District recounted the evidence in the jury trial. A police officer, David Dammon, testified that the drug transactions occurred in a McDonald's parking lot in Belvidere and that "[t]he Evangelical Covenant Church was located northeast of the

McDonald's," 860 feet at the most, according to a laser measuring device Dammon had used. *Cadena*, 2013 IL App (2d) 120285, ¶ 5.

¶ 119     Another witness was Leon Barry, who testified he had been a Belvidere police officer for 27 years. *Id.* ¶ 6. The prosecutor asked Barry:

" 'Q. [Prosecutor:] Now, in relation to the McDonald's located at 11–sorry–1313 North State Street in Belvidere, Boone County, Illinois, is it located near the Evangelical Covenant Church locate[d] at 220 East Harrison Street in Belvidere, Boone County, Illinois[?]

A. [Officer Barry:] Yes.

Q. And in relation to that particular church, is that a church that is an active church?

A. Yes.' " *Id.*

¶ 120     For two reasons, the Second District held that this testimony by Barry was insufficient to prove that the Evangelical Covenant Church was being used primarily for religious worship on the dates of the offenses. First, the leading question to Barry was couched in the present tense: " '[I]s that a church that is an active church?' " *Id.* ¶ 16. That the church was active at the time of the trial did not prove it was active on the dates of the offenses. *Id.* Second, "[e]ven if Officer Barry's response could be taken to mean that the church was also active on the dates of the offenses two years before the trial, there was no evidence of *how* Officer Barry knew this information." (Emphasis in original.) *Id.* ¶ 17. The Second District interpreted *People v. Morgan*, 301 Ill. App. 3d 1026 (1998), as "requir[ing] more than the bare facts that the witness [was] a police officer with a certain number of years of service; it require[d] the demonstration and explanation of how the witness [was] familiar with the enhancing location (park, school, church, or the like)" (*Cadena*, 2013 IL App (2d) 120285, ¶ 17): for example, the police officer had "regularly patrolled the neighborhood" (*id.* ¶ 18).

¶ 121     The Second District noted that, even though *Foster* had relied on *Morgan* "for the proposition that the nomenclature alone was sufficient to establish that the church was what its name purported it to be," nomenclature actually was not enough under *Morgan*: the police had to demonstrate and explain how he was personally familiar with the building's use on the dates of the offenses. *Id.* ¶ 17.

¶ 122     The State conceded, in *Cadena*, that "nomenclature alone [was] insufficient to prove that the *** church[ ] [was] being used as its name implie[d]." *Id.* ¶ 15. Before even acknowledging the State's concession, however, the Second District held that "testimony identifying the building as the 'Evangelical Covenant Church' was insufficient to prove that it was operating as a church on the dates of the offenses." *Id.* ¶ 13. Nomenclature was "not enough to prove beyond a reasonable doubt that the building in question was being used as its name implied, that is, as a church, on the dates of the offenses." *Id.*

¶ 123                                    *3. Boykin*

¶ 124     In *Boykin*, the trial court convicted the defendant, in a bench trial, of unlawful delivery of a controlled substance within 1,000 feet of a school (720 ILCS 570/407(b)(2) (West 2008)). *Boykin*, 2013 IL App (1st) 112696, ¶ 1.

¶ 125     On appeal, the defendant did not dispute he was guilty of unlawfully delivering a controlled substance. *Id.* He contended, however, that the State had failed to prove, beyond a reasonable doubt, that he delivered the controlled substance within 1,000 feet of a school. *Id.*

¶ 126    Two police officers testified in the bench trial. Jennifer Przybylo testified she was working as an undercover police officer on December 11, 2008, and that while she was sitting in an unmarked car at the intersection of 79th Street and Jeffrey Boulevard in Chicago, the defendant sold her some cocaine. *Id.* ¶ 2. She testified there was a school on the northeast corner of that intersection, about 100 feet from her vehicle, and that "there was a sign posted[ ] and the school's name was 'Our Lady of Peace.' " *Id.*

¶ 127    Another police officer, Derrick Miller, testified he was performing surveillance at the time of the offense and that he was parked on Jeffrey Boulevard, just north of 79th Street. *Id.* ¶ 3. "As he observed the offense, he was 'sitting right next to a school, a Catholic school.' " *Id.* He answered yes when the prosecutor asked him "if that school was 'Our Lady of Peace school,' " and he testified the school "was located approximately 100 feet from Officer Przybylo's vehicle." *Id.*

¶ 128    Relying primarily on *Cadena*, the First District "[found] the evidence insufficient to prove beyond a reasonable doubt that 'Our Lady of Peace' was a school on the date of the offense." *Id.* ¶ 16. The First District reasoned:

> "We find this case analogous to *Cadena*. In the trial court, Officers Przybylo and Miller testified that the drug transaction took place within 1,000 feet of a 'school,' but there was no evidence presented to show how those officers had personal knowledge of the operation of that building. The officers did not testify that they lived in the area or that they regularly patrolled the neighborhood, so as to allow an inference that they had personal knowledge as to whether the school was in operation on the date of the offense." *Id.* ¶ 15.

¶ 129                    4. *The Parties' Arguments for and Against*
                             *the Sufficiency of Nomenclature*

¶ 130    The State argues that *Foster* is correct in holding that nomenclature alone suffices. *Cadena* is distinguishable, according to the State, because in *Cadena* the State conceded that nomenclature alone was insufficient to prove that a building was used primarily as a place for religious worship (*Cadena*, 2013 IL App (2d) 120285, ¶ 15), whereas, in the present case, the State makes no such concession. Instead, on the authority of *Foster*, 354 Ill. App. 3d at 568, the State argues that all a police officer has to do is refer to the building by using a proper name containing the word "church," and such nomenclature is proof, beyond a reasonable doubt, that the building was used primarily as a place for religious worship on the date of the offense.

¶ 131    In the State's view, the deferential standard of review applicable to issues of fact requires a reviewing court to accept nomenclature as sufficient proof of an enhancing locality. If, from the evidence in the record, an inference could reasonably be drawn in the prosecution's favor, the reviewing court should draw that inference. *People v. Price*, 2011 IL App (4th) 100311, ¶ 16. Whenever the proper name of a building includes the word "church," one could reasonably infer that the building is used primarily as a place for religious worship, the State argues. See *Foster*, 354 Ill. App. 3d at 568.

¶ 132    Defendant responds that, even though McClusky testified the building at 411 East Mulberry Street had been a church for as long as he could remember, he did not explain how he knew the building was a church on the dates of the offenses–and *Cadena* requires such an

- 16 -

explanation (*Cadena*, 2013 IL App (2d) 120285, ¶ 17). Defendant also points out that, under *Cadena*, nomenclature alone does not suffice to prove an enhancing locality. See *id.* ¶ 13.

¶ 133 Because the State "concede[d]," however, in *Cadena*, that "nomenclature alone [was] insufficient to prove that the 'enhancing locality,' *** a church, [was] being used as its name implie[d]," we do not consider *Cadena* to be reliable authority that nomenclature is insufficient. *Id.* ¶ 15. Consequently, we decline to follow the decision of the Second District in *Cadena*, and we likewise decline to follow the decision of the First District in *Boykin*, which relied on *Cadena*. Instead, we follow *Foster*, which, "viewing the evidence in the light most favorable to the prosecution, [found that] a rational trier of fact could have inferred New Hope Church was a church used primarily for religious worship based on its name." *Foster*, 354 Ill. App. 3d at 568.

¶ 134 McClusky testified that he had been a police officer in Bloomington for 10 years and that for the past 5½ years he had been assigned to the narcotics unit. According to him, 411 East Mulberry Street had been a church for "as long as [he could] remember," and "[a]t the time"–by which he evidently meant "at the time of the drug offenses"–"it was Joyful Gospel Church," although it had "changed its name" since then. He answered yes to the prosecutor's question of whether the church was "open the day [he and the prosecutor were] talking about," February 4, 2011.

¶ 135 Defendant observes that, contrary to McClusky's testimony, 411 East Mulberry Street probably was not called "Joyful Gospel Church" in February 2011, considering that, according to the recorded warranty deed, Joy Full Gospel Community Church sold the property to the Living Word Ministries in November 2009. Our task, though, is to assess the sufficiency of the evidence presented in the trial (*People v. Courtney*, 288 Ill. App. 3d 1025, 1036 (1997); *People v. Summers*, 202 Ill. App. 3d 1, 9 (1990)), and even though courts may take judicial notice of public records (*Lubershane v. Village of Glencoe*, 63 Ill. App. 3d 874, 878 n.1 (1978)), judicial notice is incapable of transforming the warranty deed into evidence presented in the trial.

¶ 136 Defendant contends that the evidence presented in the trial fails to prove, beyond a reasonable doubt, that 411 East Mulberry Street was used primarily as a church, considering that McClusky never disclosed the basis of his assertion that the building was in use as "Joyful Gospel Church" on the dates of the drug offenses: in other words, he never explained how he knew that assertion to be true. Obviously, any objection premised on the lack of a foundation is procedurally forfeited because defense counsel made no such objection at trial. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Even so, the lack of a foundational objection did not free the State from its burden of proving, beyond a reasonable doubt, that, on the dates of the drug offenses, 411 East Mulberry Street was used primarily for religious worship. Testimony can be so conclusory, so weak in its foundation, that no rational trier of fact would regard it as proof beyond a reasonable doubt. *People v. Cowan*, 49 Ill. App. 3d 367, 369 (1977) (although, in response to a question by the prosecutor on direct examination, an investigator stated that Spiegel Warehouse owned a shirt that the defendant allegedly stole, "this [was] merely a conclusory statement" and not proof, beyond a reasonable doubt, that the shirt belonged to someone other than the defendant–an essential element of theft). If, in a burglary trial for instance, the only evidence the prosecutor presented was testimony by a police officer that "Bart Lawbreaker broke into 123 Elm Street and stole jewelry," the testimony would be objectionable because it lacked a foundation. The basis of the police officer's reputed knowledge would be unexplained; it would be unclear how he knew what he claimed to know.

Defense counsel, however, would not necessarily want to make a foundational objection, which would educate the prosecutor and invite him or her to remedy the fatal deficiency.

¶ 137　　Whether the omission of a foundation, without any objection, is fatal to the State's case depends on the standard of review that applies to all challenges to the sufficiency of the evidence. "In reviewing the sufficiency of the evidence to sustain a verdict on appeal, the relevant inquiry is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Cooper*, 194 Ill. 2d 419, 430-31 (2000) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The lack of a foundational objection means the testimony, for whatever it is worth, becomes part of the evidence: it is "given its natural probative effect." *People v. Collins*, 351 Ill. App. 3d 175, 180 (2004). So, the question is whether McClusky's testimony, lacking a foundation, could persuade *any* rational trier of fact, beyond a reasonable doubt, that on February 4 and 8, 2011, the building at 411 East Mulberry Street was used primarily as a place for religious worship. See *Cooper*, 194 Ill. 2d at 430-31. In answering that question, we should draw any inference in the prosecution's favor if it would be reasonably defensible to draw that inference from the evidence presented in the trial. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

¶ 138　　The line between a reasonable inference and speculation can be difficult to locate, but it seems reasonable to infer that, in McClusky's particular line of work, one would become familiar with Bloomington, such that one could say whether a given church was active. Bloomington is not so large that such knowledge would be unattainable or implausible. McClusky's assignment for the past 5½ years had been citywide drug interdiction. Because he worked with confidential sources, he evidently did not spend all his time behind a desk. Surely, being in the narcotics unit meant spending a lot of time on the streets, doing controlled purchases and surveillance and keeping an eye on neighborhoods. That is the only way one could hope to catch a significant number of drug dealers. How or whether buildings are used would seem to be of particular interest to a police officer on the lookout for crack houses and methamphetamine laboratories. Therefore, when we look at the evidence in the light most favorable to the prosecution, a rational trier of fact could have believed McClusky's testimony that he was familiar with the neighborhood of 411 East Mulberry Street and that the building at that address was in use as a church on the dates of the drug offenses.

¶ 139　　　　　　　D. Defense Counsel's Failure To Investigate
the Ownership of 411 East Mulberry Street

¶ 140　　Defendant argues that, in the *Krankel* hearing, he showed possible neglect of the case by McEldowney and that the trial court therefore should have appointed new counsel to represent him in posttrial proceedings.

¶ 141　　As defendant acknowledges, *Krankel* and its progeny do not require the automatic appointment of new counsel whenever a defendant makes a claim of ineffective assistance. *People v. Moore*, 207 Ill. 2d 68, 77 (2003). Instead, the court should "first examine the factual basis of the defendant's claim," and if the court "determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion." *Id.* at 77-78. If, on the other hand, "the allegations show possible neglect of the case, new counsel should be appointed." *Id.* at 78.

¶ 142     Because the trial court made a decision on the merits of defendant's claim of ineffective assistance of counsel, we will review the decision for manifest error. See *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25. "Manifest error" is error that is clear and indisputable. *Id.*

¶ 143     We are unable to say it is clear and indisputable that McEldowney should have presented the warranty deed as evidence in the trial. True, the warranty deed would have proved McClusky was wrong in his testimony that the building at 411 East Mulberry Street was "Joyful Gospel Church" on the dates of the drug offenses. But one must consider the price the defense would have paid to prove that McClusky was wrong about the name. The warranty deed also would have proved that, on the dates of the drug offenses, a religious organization, The Living Word Ministries, owned the building–a religious organization that, according to a photograph of the monument sign taken a week before the trial, held a worship service on Sundays and Bible study on Wednesdays. Arguably, the warranty deed would have hurt the defense more than helped it.

¶ 144                                    III. CONCLUSION

¶ 145     For the foregoing reasons, we affirm the trial court's judgment. We award the State $50 in costs against defendant.

¶ 146     Affirmed.