**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2019 IL App (3d) 170488-U

Order filed November 19, 2019

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois, |
| Plaintiff-Appellee, | ) ) | Appeal No. 3-17-0488 |
| v. | ) ) | Circuit No. 15-CF-295 |
| MARIO KEEL, | ) ) | Honorable Kathy S. Bradshaw-Elliott, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE CARTER delivered the judgment of the court.
Justice Wright concurred in the judgment.
Justice McDade specially concurred.

**ORDER**

¶ 1     *Held*:  The State presented sufficient evidence to prove defendant's guilt beyond a reasonable doubt. Even assuming counsel provided deficient representation for failing to file a motion to suppress, defendant did not suffer prejudice. This court lacks jurisdiction to consider defendant's challenge to his sentence.

¶ 2     Defendant, Mario Keel, appeals his convictions and sentences. He contends the evidence

was insufficient to prove his guilt beyond a reasonable doubt. He also contends that his counsel

provided ineffective assistance for failing to file a motion to suppress evidence. Alternatively, he

asks this court to remand the matter to the trial court to correct his sentence. We affirm and remand with directions.

¶ 3                                                    I. BACKGROUND

¶ 4          The State charged defendant with three counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(4) (West 2014)) committed while defendant was in a position of trust and authority over the victim, T.F.[1] The first charge alleged that between May 1 and June 7, 2015, defendant sexually penetrated T.F. by placing his penis in her vagina. The second charge alleged the same time period but added that defendant committed the offense by placing his mouth on T.F.'s vagina. The third charge alleged that on or about June 8 and 9, 2015, defendant sexually penetrated T.F. by placing his penis in her vagina. The State also charged defendant with unlawful residency of a child sex offender (*id.* § 11-9.3(b-10)) that alleged on June 8, 2015, defendant, a child sex offender, knowingly resided within 500 feet of a day care. The cause proceeded to a bench trial.

¶ 5          At trial, T.F. testified that she was born on May 27, 1999. T.F.'s mother, Mildred J., was previously married to defendant. Defendant was T.F.'s stepfather. In 2012 to 2013, T.F. lived with Mildred and defendant. During that time, defendant would say inappropriate things to her, such as telling her to remove her shirt if she lost the videogame they were playing. Defendant also performed inappropriate acts toward her like touching her buttocks, breasts, and vagina. T.F. allowed defendant to do these things, and defendant told her not to tell anyone because he could get "locked up" again.

---

[1]The State also included three additional charges of criminal sexual assault. Those charges were alternate bases that alleged that defendant was a family member rather than a person in a position of trust and authority. The court did not make a finding of guilt or enter a judgment of conviction on these charges. No issue is raised with these charges.

¶ 6        T.F. would ultimately change residences several times. At one point, she moved in with her biological father because she had been caught stealing. However, sometime in May 2015, T.F. moved back in with Mildred, defendant, and her brother. During that time, defendant continued to touch her inappropriately. According to T.F., defendant would touch her everywhere including touching her vagina with his fingers, tongue, and penis. T.F. stated that these acts happened "every day." T.F. stated that Mildred confronted her several times asking if anything was happening between T.F. and defendant. T.F. would lie to Mildred and say that nothing happened between them.

¶ 7        On June 8, 2015, T.F. and defendant were alone inside the house. Mildred was at work. Defendant was on the couch, and T.F. asked if he could sleep in his bed so that she could sleep on the couch. Defendant asked T.F. to remove her clothes. T.F. went to her bedroom, removed her clothes, and returned to defendant in the living room. Defendant had removed his pants, and the two laid on the couch. Defendant then had sexual intercourse with T.F. Defendant ejaculated on himself and a zebra-patterned blanket. Right after this, T.F. heard Mildred at the front door. T.F. ran to her bedroom to put on her clothes. Mildred entered T.F.'s bedroom as she was putting on her pants—T.F.'s shirt was not on at the time. Mildred was angry and confronted T.F. and defendant.

¶ 8        T.F. then went to her aunt's house across the street. Mildred arrived approximately 10 minutes later. Mildred went outside to yell at defendant then asked T.F. to return to the house. T.F. told Mildred that defendant had been touching her. Defendant took the zebra-patterned blanket and a few other items and left.

¶ 9        Mildred testified that defendant was her ex-husband. On June 8, 2015, she called off work due to an illness. She worked the night shift. She did not tell defendant this because she

3

suspected that defendant was having sexual intercourse with T.F. She left at her usual time for work, leaving defendant and T.F. home alone. Mildred parked across the street then walked around to the side of the house. She looked in the window. The blinds were only partially closed, and it was dark. Mildred saw defendant sleeping on the couch. T.F. woke defendant then went to her bedroom. T.F. returned to the couch then ducked down out of view. Mildred saw movement but could not see what was happening. Defendant then stood up and looked down at the front of his shirt. It appeared to Mildred that defendant was wiping his penis with his shirt. Mildred believed that defendant was having sexual intercourse with T.F.

¶ 10      Mildred went to the front door. She started to unlock the door and heard movement inside the house. When Mildred entered and went into T.F.'s bedroom, T.F. was naked and putting her clothes on. Mildred yelled at T.F. and defendant. Mildred "physically attacked" defendant and pushed him out of the house. Defendant packed a bag with belongings, including the zebra-patterned blanket. Later, Mildred called defendant's mother and asked for the shirt defendant was wearing. Defendant's mother refused. Mildred took T.F. to the hospital.

¶ 11      A nurse at the hospital testified that she spoke with T.F. about her reason for visiting the hospital. A doctor examined T.F. and the nurse provided law enforcement a sexual assault kit. Nothing unusual was noted during the exam.

¶ 12      Detective David Skelly testified that on June 9, 2015, he spoke to Mildred and went to her home to collect evidence. Skelly also went to defendant's mother's house to speak with defendant. Skelly asked defendant to come to the police station to discuss T.F.'s and Mildred's accusation. Before leaving for the police station, Skelly spoke to defendant's mother to collect possible evidence, including the shirt defendant wore that day and the zebra-patterned blanket. Defendant's mother would not let Skelly inside her house. However, she retrieved the shirt and

4

blanket and gave them to Skelly. When he received defendant's shirt, he noticed that it was wet and smelled like bleach. He also did not see any blood on the shirt.

¶ 13    Skelly also measured the distance from defendant's residence and a nearby day care. He used a measuring wheel to make the measurement. The measuring wheel was commonly used by the police department to measure distances. Skelly explained the operation of the wheel. He calibrated the wheel by pressing the reset button, then he rolled the device. As the device rolled, it counted feet. Skelly did not know how the internal functions of the wheel worked. He did not have training in maintaining the measuring wheel. He did not know if the wheel had been tested for accuracy, but he believed that the police department tested the device every year or two. Skelly did not know when the measuring device had last been tested for accuracy. Although Skelly acknowledged that the device could have been damaged in a way that interfered with measuring, he did not see any evidence that it had been damaged or tampered with in any way. Skelly believed the wheel worked "exactly as it should," when he made the measurement. He walked as close to a straight line as possible when he measured the distance between defendant's residence and the nearby day care. The measurement between the two locations was 466 feet. He made four measurements, twice in each direction. All the measurements came within two feet of each other.

¶ 14    The Illinois State Police Crime Laboratory performed DNA analysis on defendant's shirt and the zebra-patterned blanket. The shirt contained DNA profile mixtures of two people. One from T.F. and one from defendant. The shirt also had semen on it that matched defendant's DNA. The blanket had two stains tested. The first stain contained a mixture of two DNA profiles. The major DNA profile belonged to defendant. As to the minor DNA profile, neither T.F. nor Mildred could be excluded. The first stain contained semen matching defendant. As to

5

the second profile from the blanket, it contained defendant's DNA and the DNA of another profile. T.F. could not be excluded from this profile, but Mildred was excluded. The second stain contained defendant's semen.

¶ 15        Tracy Monferdini testified that she was a secretary for the Detective Bureau of the Kankakee City Police and was responsible for registering sex offenders. When sex offenders register, she would inform them if they could not live in a certain area. She usually allows an offender 30 days to move if their residence is in a prohibited location. On July 1, 2014, defendant registered his residence with her. Monferdini used a map provided by the city planner to check if defendant's residence was in a prohibited area. The map contained predrawn 500-foot circles. She used the predrawn circle and a compass to draw a new circle around defendant's residence. She checked the map and determined that defendant's residence prohibited because it was within 500 feet of a day care. She informed defendant that he could not register the address and gave defendant 30 days to find a new home. Defendant did not return to notify her.

¶ 16        On cross-examination, Monferdini testified that she did not know the specific distance between the two locations. She only knew that the two locations were within 500 feet. She did not know if the map had been authenticated, calibrated, or tested for accuracy. She did not believe the map was designed for the same purpose she used it for. She was not trained in calibrating distances.

¶ 17        Defendant testified in his own defense. He denied performing any of the sexual acts described by T.F. He acted as T.F.'s disciplinarian, and T.F. would get upset when he disciplined her. Mildred was very lenient. He explained that T.F.'s DNA probably got on his shirt because she had recently cut her hand and wiped it on his shirt. He also believed that his semen may have been on his shirt and blanket because he masturbated that afternoon. The blanket belonged to

6

him. On June 8, 2015, he was asleep on the couch but was awoken by T.F. He and T.F. had an argument over T.F.'s chores. Defendant believed that Mildred was home at the time, so he went into her bedroom, but she was not there. Mildred then "busted in" and went into T.F.'s bedroom. Mildred then accused defendant of having sexual relations with T.F. He and T.F. were clothed at the time. Mildred struck him, he took his blanket and other personal items and went to his mother's home.

¶ 18    Skelly came to defendant's mother's home later and asked defendant about his shirt. Defendant did not bleach his shirt, but an officer accused him of bleaching it. He believed his shirt was wet because he had stepped on it after taking a shower. He also told Skelly that there would be semen on his shirt and blanket because he had masturbated.

¶ 19    In rebuttal, Skelly testified that when he interviewed defendant at the police department defendant stated that there would be no semen on his shirt. He also explained that his shirt was wet because Mildred made him bleed when she hit him, and he used the shirt to pat the blood from his mouth. Defendant also did not tell Skelly that the reason T.F.'s DNA would be on his shirt was that he used the shirt to cover her injured finger.

¶ 20    Ultimately, the trial court found defendant guilty of three counts of criminal sexual assault and one count of unlawful residency of a child sex offender. The court later denied defendant's motion for a new trial. In denying the motion, the court found that T.F.'s testimony "very clear," and that the evidence supported defendant's convictions. Prior to sentencing defendant, the court also noted that it found T.F. and Mildred extremely credible witnesses. In its oral pronouncement, the court imposed three consecutive 10-year sentences for the criminal sexual assault convictions. The court also imposed a consecutive two-year sentence for unlawful residency of a child sex offender to be served at 50%. The court also stated that defendant would

7

receive presentence custody credit starting from June 9, 2015. However, the written sentencing order only awarded defendant with credit from June 19, 2015. The order required defendant to serve 85% of his sentence for unlawful residency of a child sex offender.

¶ 21                                    II. ANALYSIS

¶ 22        On appeal, defendant contends that the State failed to prove that he committed the offense of unlawful residency of a child sex offender beyond a reasonable doubt. Defendant also contends that defense counsel provided ineffective assistance for failing to file a motion to suppress evidence. Lastly, defendant challenges the court's sentencing order. We discuss each argument in turn.

¶ 23                          A. Sufficiency of the Evidence

¶ 24        First, defendant contends that the State failed to prove that he committed the offense of unlawful residency of a child sex offender. Section 11-9.3(b-10) of the Criminal Code of 2012, (Code) (720 ILCS 5/11-9.3(b-10) (West 2014)), makes it "unlawful for a child sex offender to knowingly reside within 500 feet of a playground, child care institution, day care center, part day child care facility, day care home, group day care home, or a facility providing programs or services exclusively directed toward persons under 18 years of age."

¶ 25        At the outset, we note that defendant does not dispute that the State presented sufficient evidence to prove that he was a child sex offender. Defendant also does not dispute the location of his residence or the location of the child day care center. Rather, defendant only argues that the State failed to prove that his residence was within 500 feet of the day care.

¶ 26        "When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant." *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Rather, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the

8

prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Thus, "the reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). "A conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Belknap*, 2014 IL 117094, ¶ 67.

¶ 27        Here, Skelly used a measuring wheel to measure the distance between defendant's residence and the day care. The measuring wheel was kept at the police department and the device was regularly used by the police department for measuring longer distances. Skelly was familiar with the device. He did not notice any damage to the device or any indication that the device was not operating correctly. In his view, the measuring wheel worked "exactly as it should." He measured the distance between the two locations twice each way. In all four measurements, the total distance was within two feet of a 466-foot measurement. Skelly's testimony is supported by Monferdini's testimony that she used a map provided to her by the city planner to make her measurement. She used a compass and traced a 500-foot circle using the predrawn circles created by the city planner. Based on this, we find that a rational trier of fact could conclude that the distance between the two locations was within 500 feet.

¶ 28        Despite this, defendant contends that the State failed to prove that the measuring wheel and map provided accurate measurements. Defendant contends that the evidence only established that the measuring wheel worked consistently rather than accurately. According to defendant, Skelly's failure to test the device for accuracy renders the evidence insufficient. Defendant also contends that Monferdini's use of the map was unreliable because she did not have independent knowledge of the map's accuracy. In other words, defendant contends that the State failed to

9

establish a proper foundation for the accuracy of both witnesses' measurements. Defendant did not make a foundational objection to either witnesses' testimony. "The lack of a foundational objection means the testimony, for whatever its worth, becomes part of the evidence: it is 'given its natural and probative effect.' " *People v. Sims*, 2014 IL App (4th) 130568, ¶ 137 (*quoting People v. Collins*, 351 Ill. App. 3d 175, 180 (2004). Consequently, the question presented is whether Skelly's and Monferdini's testimony, lacking a foundation, could persuade any rational trier of fact, beyond a reasonable doubt, that the distance between the two locations was within 500 feet. In answering this question, "we should draw any inference in the prosecution's favor if it would be reasonably defensible to draw that inference from the evidence presented in the trial." *Id.*

¶ 29    As defendant concedes neither Skelly nor Monferdini needed to be an expert to testify to their measurements. Therefore, the law does not require that either witness be well-versed on the scientific principles behind the measuring wheel or map. *People v. Burch*, 19 Ill. App. 3d 360 (1974). Based on the evidence presented, it is reasonable to infer that the measuring wheel used by Skelly provided an accurate measurement. The police department routinely used the device and Skelly observed that it was working properly when he made the measurement. Although he did not recall the specific instance, Skelly did know that the department tested the device for accuracy. The fact that the device was working consistently also supports an inference that it was operating accurately. Likewise, Monferdini used a map provided to her by the city planner that contained predrawn 500-foot circles. She used a compass and the predrawn circles to create a base 500-foot measurement. It is reasonable to infer that the compass Monferdini used was therefore calibrated to make 500-foot measurements, which she used to calculate the distances between the two locations. Ultimately, defendant's argument is an attack on the weight of

Skelly's and Monferdini's testimony. Although defendant thoroughly cross-examined both witnesses as to the accuracy of their measurements, there is no evidence that either measurement was inaccurate or unreliable. The court considered all the evidence and determined that the measurements were accurate. Given that there is no evidence to suggest that either of the measurements were inaccurate, we conclude that the court's finding is reasonable.

¶ 30                              B. Ineffective Assistance

¶ 31        Next, defendant contends that defense counsel provided ineffective assistance for failing to file a motion to suppress evidence—defendant's shirt and blanket. Specifically, defendant contends that the evidence was improperly obtained by police because his mother had neither an actual nor apparent ownership in the items. Even assuming counsel was deficient for failing to move to suppress this evidence, we find that defendant suffered no prejudice.

¶ 32        An attorney's decision whether to file a motion to suppress is generally a matter of trial strategy that is entitled to great deference. *People v. White*, 221 Ill. 2d 1, 21 (2006). To establish prejudice resulting from counsel's failure to file a motion to suppress evidence, a defendant must show that: (1) the unargued suppression motion would have succeeded, and (2) there is a reasonable probability that the outcome of the trial would have been different had the evidence been suppressed. *People v. Henderson*, 2013 IL 114040, ¶ 12. A defendant's failure to establish either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *People v. Patterson*, 217 Ill. 2d 407, 438 (2005). In the present context, defendant must show that he was prejudiced by the admission of his blanket and shirt at trial.

¶ 33        In this case, we find that there is no reasonable probability that the outcome of the trial would have been different had the evidence been suppressed. Here, the court found T.F.'s testimony "extremely" credible. She testified that between May 1 to June 7, 2015, defendant

11

assaulted her multiple times by placing both his penis and mouth on her vagina. T.F. also provided a detailed account as to the assault occurring on June 8, 2015. She explained how she went into her bedroom, removed her clothes, then returned to have sexual intercourse with defendant on the couch. Mildred's testimony corroborates T.F.'s story in that she observed T.F. return from her bedroom naked and duck down onto the couch with defendant. After the act, T.F. and Mildred both consistently testified that Mildred encountered T.F. in her bedroom putting her clothes back on. Although Mildred did not observe the two having sexual intercourse, it can be inferred that they did given that T.F. got onto the couch naked with defendant, made movements, then returned to her bedroom to dress after defendant stood up. Given the direct, clear, testimony of T.F., and Mildred's corroboration, we find that the evidence overwhelmingly supports defendant's convictions without even considering the admission of defendant's shirt and blanket. Therefore, we hold that defendant was not prejudiced by counsel's failure to file a motion to suppress.

¶ 34    In reaching this conclusion, we reject defendant's argument that the DNA evidence played a significant role in his convictions. According to defendant, the DNA evidence supported T.F.'s and Mildred's testimony while undermining his credibility. Without the DNA evidence, defendant contends that he would not have been impeached for his inconsistent explanations as to why his shirt was wet, smelled like bleach, contained his semen, and possibly contained T.F.'s DNA. Defendant therefore argues that the trial would have become a simple "he-said, she-said case" without his shirt and blanket used as evidence. It is true that this evidence tended to support T.F.'s and Mildred's testimony and undermined defendant's testimony. However, defendant's argument ignores the fact that there are two corroborating

12

witnesses which provided clear, detailed, and consistent descriptions of the events that occurred on June 8, 2015. Thus, the evidence still strongly supports defendant's convictions.

¶ 35                                                    C. Sentencing Errors

¶ 36        Finally, defendant asks this court to remand the matter with directions for the trial court to amend the mittimus to reflect its oral pronouncement that defendant must serve 50% of his sentence for unlawful residency of a child sex offender. Defendant also asks that we remand for the trial court to award him sentencing credit beginning with his custody date of June 9, 2015. Pursuant to Supreme Court Rule 472, we lack jurisdiction to address this argument. Ill. S. Ct. R. 472(a)(3) (eff. May 17, 2019). Rule 472 provides that the trial court retains jurisdiction to correct certain sentencing errors, "[e]rrors in the calculation of presentence custody credit," and clerical errors in the written sentencing order at any time following judgment. *Id.* Rule 472(e) provides that where, as here, a criminal case was pending on appeal as of March 1, 2019, and a party raised sentencing errors covered by Rule 472 for the first time on appeal, "the reviewing court shall remand to the circuit court to allow the party to file a motion pursuant to this rule." Ill. S. Ct. R. 472(e) (eff. May 17, 2019). Thus, pursuant to Rule 472(e), defendant must first file a motion in the trial court requesting the correction of the errors alleged here. *People v. Whittenburg*, 2019 IL App (1st) 163267, ¶ 4. We note that the State has conceded both these errors on appeal, and we instruct the trial court to treat defendant's argument on appeal as if it were a motion filed in the trial court.

¶ 37                                                    III. CONCLUSION

¶ 38        The judgment of the circuit court of Kankakee County is affirmed and remanded with directions.

¶ 39        Affirmed and remanded with directions.

¶ 40        JUSTICE McDADE, specially concurs.

¶ 41        I concur with the majority's judgment.  However, I am concerned with the evidence presented in this case.  When presented with a challenge to the sufficiency of the evidence, we may allow all reasonable inferences in favor of the State.  *People v. Martin*, 2011 IL 109102, ¶ 15.  However, this favorable standard does not relieve the State of the obligation of laying a proper foundation regarding the accuracy of technical evidence.  Nor does it relieve defense counsel of the duty of objecting to the State's failure to do so.